**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PREWETT ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-CV-04254 |
| | ) | |
| GRAND TRUNK WESTERN | ) | Judge John J. Tharp, Jr. |
| RAILROAD CO. et al | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Prewett Enterprises, Inc. brings this suit against Grand Trunk Western Railway Co. ("GTW") and Canadian National Railway Co. ("CNR") for breach of contract and quantum meruit. The defendants have jointly filed a motion to dismiss for failure to state a claim and CNR has independently filed a motion to dismiss for lack of personal jurisdiction. Because Prewett's third amended complaint ("TAC") fails to adequately state a claim upon which relief can be granted, the defendants' joint motion to dismiss for failure to state a claim is granted with prejudice. CNR's motion to dismiss for lack of personal jurisdiction is denied as moot.

## BACKGROUND

Prewett provides railway construction and salvage services. According to the operative complaint, Prewett has had a longstanding business relationship with the defendants and other affiliated railroad companies. This case involves claims by Prewett that the defendants have failed to pay Prewett for services provided and that they have not offered work to Prewett to which Prewett claims a contractual right of first refusal.

Prewett's claims implicate several contracts. The primary contractual agreement Prewett invokes is the Master Services Agreement ("MSA"), which was executed in April 2015. The MSA identifies the parties to the agreement as Prewett, on the one hand, and eight companies, including

GTW, on the other; it is undisputed that these companies are subsidiaries of CNR, but CNR is not identified in the MSA as a party to the agreement. The MSA "covers work not specifically covered by another contract." TAC Ex. A ¶ 40, ECF No. 58. In addition, Prewett alleges that the defendants breached a number of separate bid contracts, or contracts for a specific project occurring over a predetermined duration of time. Unlike the MSA, these contracts are governed by a bid process in which "CNR or one of its subsidiaries," *id*. ¶ 20, place specific projects up for bids from different contractors. A contractor, such as Prewett, would then be selected to fulfill the contract. The bid contracts do not expressly identify the company contracting with Prewett, though they are addressed to an individual at "CN Railroad." The TAC alleges that MSA and bid project payments were made by GTW until the spring of 2017, when GTW stopped paying invoices sent by Prewett for services performed under both the MSA and various bid contracts.

The TAC also describes the ERSA, which was effective on May 1, 2013. The ERSA reflects that it was executed by defendant CNR "not in its own capacity, but solely as an agent for its U.S.-based operating railroad subsidiaries." TAC Ex. C at 1. The ERSA states that Prewett would have the first opportunity to provide those companies with emergency derailment services when needed from an external contractor. Prewett alleges that during the nine-month span from August 2013 to April 2014, CNR breached the ERSA by giving other parties the first opportunity to provide those services.

Prewett filed an initial three-count complaint against seven defendants, including CNR and GTW, on June 19, 2018. The complaint alleged an account stated under the MSA, a breach of the MSA in the alternative, and a breach of other project-specific contracts. Before any defendant answered, Prewett filed an amended complaint on July 30, 2018. The six named defendants who had been served (all but CNR) filed a motion to dismiss for failure to state a claim as well as

counterclaims alleging fraud and bribery by Prewett.[1] On August 30, 2018, the Court orally granted the motion to dismiss without prejudice and granted Prewett leave to file a second amended complaint ("SAC"). In denying the motion, the Court explained that the complaint was "completely bare bones" and that it merely presented "conclusory allegations and recitation of the elements of the offense." Tr. of Proceedings, 3 Aug. 30, 2018, ECF No. 39. The Court noted that although breach of contract is a straightforward legal theory, a proper breach claim requires at least some level of factual detail sufficient to provide notice of the alleged breach(es), such as the services Prewett performed that the defendants are alleged not to have paid for, when and how Prewett performed those services, and for whom those services were provided. In addition, the Court pointed out that the MSA includes multiple contractual provisions allowing parties to the contract to withhold payment without being in breach, and that it would behoove the plaintiff to include facts in its SAC sufficient to plausibly allege that those carve-outs do not apply to the current case.

In the aftermath of that ruling, Prewett moved to voluntarily dismiss the complaint under FRCP 41 so that it could refile in state court, purportedly because it believed that the case (which had then been pending for less than three months) might be resolved more quickly there. The Court denied Prewett's motion orally on September 20, 2018, due to the fact that it had already ruled upon a fully briefed motion to dismiss and that the defendants had answered and filed counterclaims. The following day, Prewett filed its SAC, which dropped the account stated claim and dismissed five of the seven initially named defendants, leaving only GTW and CNR. In response, CNR, which had been served shortly after the filing of the SAC, filed a motion to dismiss

---

[1] Pursuant to the procedures of the Mandatory Initial Discovery Pilot (MIDP) program, the same parties also answered the amended complaint.

for lack of personal jurisdiction and CNR and GTW jointly filed a motion to dismiss for failure to state a claim.

Rather than contesting the motions targeting the SAC, Prewett elected to file a third amended complaint (again, the "TAC"). ECF No. 58. This fourth iteration of the complaint introduced claims relating to the ERSA. The TAC comprises six counts: one breach of contract claim and one quantum meruit claim for each of the three contract types (the MSA, bid contracts, and the ERSA). Now before the Court are the third motion to dismiss for failure to state a claim and CNR's second motion to dismiss for lack of personal jurisdiction. ECF No. 68, 69.

## DISCUSSION

Typically, a court would resolve issues of personal jurisdiction before addressing a Rule 12(b)(6) motion, but a court may instead decide a case on the merits when the "jurisdictional question is complex or difficult" or even when the case "clearly must be decided in favor of the party challenging jurisdiction, thereby obviating any need to decide the [jurisdictional] question." 4 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1067.6; *see, e.g., Evangelical Benefit Trust v. Lloyd's Underwriters Syndicate Nos. 2987, 1607, 1183 & 2001,* No. 09-cv-4004, 2010 WL 2927404, at *3 (N.D. Ill. July 19, 2010). Because the pending motion to dismiss for failure to state a claim under FRCP 12(b)(6) clearly must be granted, as well as the fact that the jurisdictional issue only applies to one of the two defendants, the Court turns first to the 12(b)(6) motion.[2]

---

[2] The Court has also considered whether the TAC adequately establishes subject matter jurisdiction—most particularly, whether the TAC adequately alleges that the amount in controversy exceeds the jurisdictional threshold of $75,000. The general rule is that the claims of multiple litigants cannot be aggregated to reach the jurisdictional amount in controversy. *See Snyder v. Harris*, 394 U.S. 332, 335 (1969). The Seventh Circuit has explained that the anti-aggregation rule "applies both to cases in which multiple plaintiffs seek to combine their claims against a single defendant *and to those brought by a single plaintiff against multiple defendants.*"

To overcome a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff devotes the bulk of the allegations in the TAC to the issue of personal jurisdiction with respect to CNR, to the detriment of the factual basis for its claims. One aspect of the personal jurisdiction dispute is relevant to the question of whether the TAC states a plausible

---

*Travelers Prop. Cas. v. Good*, 689 F.3d 714, 717–18 (7th Cir. 2012) (internal citations omitted) (emphasis added). The TAC, however, lacks any express allegation that either of the defendants is individually liable for damages in excess of $75,000. Instead, the TAC merely alleges that this Court has diversity jurisdiction "over all claims in this lawsuit under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy, exclusive of interest and costs, is in excess of $75,000." TAC ¶ 6. Rather than allege that its claims against CNR and GTW are each in excess of  the jurisdictional threshold, the TAC aggregates the damages attributable to "the Defendants": with respect to the MSA, the TAC alleges that "Defendants have breached the MSA" and that "Defendants owes [sic] Prewett approximately $1,907,491.87 in unpaid MSA invoices" plus interest; with respect to the bid projects, it alleges that "Defendants have breached the Bid contracts" and that "Defendants owe Prewett approximately $395,767.98" plus interest; and with respect to the ERSA, it alleges that "Defendants breached the ERSA" and that "Defendants" owe an unspecified amount of money for "work Prewett performed under the ERSA in May, June, and July 2013." TAC. ¶¶ 129, 131, 141, 144, 149, 151. None of these allegations tells us that Prewett has a claim against a specific defendant that is in excess of $75,000. But that is Prewett's burden as the party asserting federal jurisdiction: "the proponent of federal jurisdiction[] bears the burden of describing how the controversy exceeds [the jurisdictional threshold]. This is a pleading requirement . . . ." *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008).

This is a more limited variation on the same problem that afflicts the TAC generally: it fails to allege even the most basic information about Prewett's claims—namely, what breaches each defendant allegedly committed. With respect to the amount in controversy question, however, the Court concludes that sufficient information can be inferred from the TAC's allegations to provide adequate assurance of the Court's jurisdiction. That is because it can reasonably be inferred that Prewett has alleged that it has incurred damages in excess of $75,000 as to at least one of the two remaining defendants (because one defendant's share of the aggregated damage claim of several million dollars will necessarily be greater than $75,000). That being the case, the Court has diversity jurisdiction over at least one of the remaining defendants and so may also exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the remaining defendant even in the absence of a claim against that defendant in excess of $75,000. Prewett does not invoke supplemental jurisdiction; the TAC alleges only diversity jurisdiction. *See* TAC ¶ 6. Nevertheless, the Court's exercise of jurisdiction is not constrained by a party's failure to properly identify the source of that jurisdiction.

claim for relief, however, and the Court addresses that at the threshold. "Prewett seeks to hold CNR responsible for non-payment of the MSA invoices by piercing the corporate veil between CNR and the eight American subsidiaries named in the MSA." Pl.'s Resp., ECF No. 74, at 14. The TAC's allegations, however, do not plausibly support Prewett's effort to disregard the separate corporate existence of CNR and its U.S. operating subsidiaries.

### 1. Corporate Veil

As a general rule, of course, "[a] corporation exists separately from its shareholders, officers, directors and related corporations, and those individuals and entities ordinarily are not subject to corporate liabilities. Indeed, one of the primary purposes of incorporation is to limit liability . . . . An exception exists when an individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business. Then a court may pierce the corporate veil, and the individual or entity may be charged for the underlying cause of action." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610–11 (7th Cir. 2009). Piercing the corporate veil is not favored and, in general, courts are reluctant to do so. *See CM Corp. v. Oberer Dev. Co.*, 631 F.2d 536 (7th Cir.1980).

A corporation's veil of limited liability will be pierced only when (1) there is "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist [,]" and (2) "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir. 1985) (quoting *Macaluso v. Jenkins*, 95 Ill. App. 3d 461, 50 Ill. Dec. 934, 420 N.E.2d 251, 255 (Ill. App. 1981) (alteration in original)). A party bringing a veil-piercing claim bears the burden of showing that the corporation is in fact a "dummy or sham"

for another person or entity. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 215 Ill. Dec. 931, 664 N.E.2d 328, 331 (Ill. App. 1996).

Prewett alleges that CNR and its subsidiaries should be treated as a single entity because "[t]here exists such a unity of interest and ownership between CNR, as parent, and the named parties to the MSA, as subsidiaries, that the separate personalities of the corporations no longer exist." TAC ¶ 58. To support its conclusory allegation, the TAC avers only that CNR participated in "one or more decisions of one or more of its subsidiaries" in such a way that the separate corporate existence between CNR and its subsidiaries should be disregarded and the corporations should be considered "dumm[ies] or sham[s] for [one] another." *Id.* ¶ 60-61. In its brief, Prewett also contends that its veil-piercing claims are supported by allegations in the TAC that the drafter of the MSA, James Kapica, "acted as an agent for Defendant CNR." TAC ¶ 35; 101

Illinois courts have established a series of factors for courts to weigh when considering if the "unity of interest" warrants piercing the veil; these include:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (quoting *Fontana v. TLD Builders, Inc.*, 362 Ill.App.3d 491, 503 (Ill. App. 2005)). The focus of this inquiry "is on whether the corporations have respected corporate formalities—respected their separateness from each other—or whether one was a sham acting at the whim of the other." *Lay-Com, Inc.*, 580 F.3d at 610–11.

The TAC's meager allegations fall far short of plausibly showing that CNR's subsidiaries are shams. Indeed, Prewett has made no allegations at all that implicate most of these factors. The TAC offers no allegations that CNR's subsidiaries are undercapitalized, have not issued stock, or do not observe corporate formalities and maintain corporate records. The TAC provides no information regarding the payment of dividends or the solvency of the subsidiaries. There are no allegations that the corporations have commingled their funds or diverted their assets.

To the extent that they implicate any factors relevant to a veil-piercing analysis, Prewett's allegations that CNR participated in decision-making by the subsidiaries and that an employee of a subsidiary acted as an agent for other subsidiaries in drafting some of the contracts at issue touch only on the issue of whether the entities maintain arm's-length relationships.[3] But the fact that there is some degree of integration between affiliated entities does not alone warrant veil-piercing "without any showing that the defendants exercised an unusually high degree of control over [the subsidiary] or that corporate formalities were not substantially observed." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 947 (7th Cir. 2000) (affiliate's provision of payroll services and use of common letterhead did not support exercise of personal jurisdiction). "Parent corporations regularly provide certain services to their subsidiaries. Such parents do not expect that performing these activities may subject them to liability because of the actions of the subsidiaries." *Id.*; *see also IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir.1998) ("Parents of wholly owned subsidiaries necessarily control, direct, and

---

[3] Prewett counters that that whether the individuals who signed the contracts in question believed CNR to be a party to the agreements is "a disputed issue of material fact" to be resolved at trial. Notably, Prewett provides no legal basis for that argument; but even if it had, the TAC does not allege facts sufficient to call that issue into question. And in any event, that belief would be relevant only to the question of which entity is a party to the contract in question, not to a veil-piercing analysis.

supervise the subsidiaries to some extent."). Of course CNR has "participated" in decisions by its wholly-owned subsidiaries, but that fact does plausibly establish that the subsidiaries are empty shells.

Prewett seeks to supplement the meager allegations of the TAC by reference to its brief in opposition to CNR's motion to dismiss for lack of personal jurisdiction. There, Prewett maintainsthat CNR uses its trade name "CN" as a shell game to mask CNR's American business and shield it from litigation in U.S. courts. As the defendants correctly argue, however, the use of trade names and common logos is ubiquitous and courts regularly hold that a plaintiff must show more than a corporate family member's use of a shared logo or trademark to substantiate a claim for veil piercing. *See, e.g., Steele v. GE Money Bank*, No. 08-CV-01880, 2009 WL 393860, at *7 (N.D. Ill. Feb. 17, 2009) (explaining that two corporate entities using the same trade name is "simply not enough to plausibly suggest that the plaintiffs have a right to relief based on an alter ego theory"); *Que Sera Promotions, Inc. v. Poughkeepsie Ford, Inc.*, No. 2:05-CV-38 PPS, 2005 WL 2896703, at *5 (N.D. Ind. Nov. 2, 2005) ("We find nothing suspicious in related cable companies utilizing the same trade name in different states.").

A shared logo or tradename is insufficient to allege that corporate boundaries are merely legal fictions or that one corporate entity exerts a unique level of influence on another. *See, e.g., Marks v. Worldwide Robotic Automated Parking, LLC*, No. 16-CV-08656, 2017 WL 2985757 (N.D. Ill. July 13, 2017) (declining to pierce the corporate veil despite a shared website and brand logo absent evidence that the parent exercised "an unusually high degree of control" over the subsidiary or that corporate formalities were not observed); *Muniz v. Walgreen Co.*, 46 F. Supp. 3d 117, 124 (D.P.R. 2014) (determining that shared trademarks, logos, advertisements, business plans, and product distribution still only "indicate that [corporate family members] share a close

branding relationship."); *Collazo v. Enter. Holdings, Inc.*, 823 F. Supp. 2d 865, 871 (N.D. Ind. 2011) (finding that evidence of a shared logo, trademark, contact and customer support information, and website "falls far short of showing that Enterprise Holdings exerts the "unusually high degree of control" over its subsidiaries needed to establish an alter ego relationship).

Courts have also declined to pierce the veil in cases in which the plaintiffs have alleged significantly more corporate overlap than has Prewett; even a showing of shared ownership, boards of directors, and employees must be accompanied by extensive degree of control or a lack of boundaries between two corporate entities. *See, e.g., Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 364-65 (7th Cir. 2016) (holding that veil piercing was not warranted despite significant integration between companies—including use of common web site, overlapping boards of directors and sharing of key employees—in the absence of evidence of misuse of corporate form); *Massey v. Cassens & Sons, Inc.*, No. 05-CV-598 DRH, 2007 WL 773382, at *3 (S.D. Ill. Mar. 12, 2007) ("Illinois courts have consistently held in the context of parent-subsidiary relationships that allegations of unity of interest which are based on mere corporate ownership or mutual directorship are insufficient to justify veil-piercing"). By comparison, Prewett's allegations that CNR and its subsidiaries' joint use of the same corporate logo and trademark, as well as the unsupported claim that an agent of CNR drafted the MSA, fall far short of the factual basis required to pierce the corporate veil.[4]

---

[4] In its briefing, Prewett also suggests that it is entitled to pierce the veil because GTW made all of the payments for services rendered under each of the contracts. Presumably, Prewett references this fact to support its claim of the unity of interest existing between CNR and GTW due to a comingling of funds. A subsidiary making payments is not, however, evidence of comingling—such payments are no different than a company outsourcing its payroll obligations to another commercial entity. GTW could very well have made payments using an account and payment structure that are completely independent from CNR.

As a final point on the issue of veil piercing, Prewett also alleges that a previous case in this district collaterally estops CNR from contesting that it is indistinguishable from its subsidiaries. Collateral estoppel, or issue preclusion, prohibits parties from relitigating issues decided in previous litigation. The Seventh Circuit has adopted a four-element test for determining whether a party is estopped from making certain claims:

> (1) the issue sought to be precluded is the same as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action.

*Adams v. City of Indianapolis*¸ 742 F.3d 720, 736 (7th Cir. 2014). Prewett contends that collateral estoppel applies because of *Kummer v. Illinois Cent. R.R. Co.*, which analyzed the parent-subsidiary relationship of CNR and the Illinois Central Railroad Company ("ICRC"), one of the previously dismissed defendants in the present case. No. 13-CV-05313, 2014 WL 5465288 (N.D. Ill. Oct. 27, 2014).

Prewett's argument fails for several reasons. First, ICRC no longer a party to the present case and CNR had previously been dismissed with prejudice in *Kummer*. Thus, the *Kummer* court but the *Kummer* court analyzed the parent-subsidiary relationship between different parties (CNR and ICRC) than the two parties remaining in this suit (CNR and GTW). Second, the legal standards applicable in the two cases also differ. In *Kummer*, the applicable legal standard was not veil-piercing, which was not discussed at all in the opinion, but rather relation back under FRCP 15(c)(1)C). Per Seventh Circuit case law, an amended complaint relates back to the original complaint when the new defendant added knew or should have known that plaintiff had not originally sued it only due to a mistake and whether the plaintiff's delay prejudices the defendant's

ability to defend itself. *Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 559–60 (7th Cir. 2011). And indeed, Judge Coleman expressly limited her determination to the context of whether the amended complaint related back. *Kummer*, 2014 WL 5465288 at *3 ("It is clear to this Court that, ***throughout the duration of the EEOC's resolution of Kummer's charge of discrimination***, CN and IC combined their corporate identity.") (emphasis added). In short, the parties and the issues in *Kummer* were different and collateral estoppel does not apply.

Prewett having failed to plausibly establish that the individual corporate identities of CNR and its subsidiaries should be ignored, the Court proceeds to assesses the sufficiency of each of the six counts in turn.

### 2 . Count I: Breach of the MSA

Count I of the complaint consists almost exclusively of conclusory statements, legal declarations, and direct quotation of contractual language. Prewett alleges that an agent of GTW drafted the MSA, which defines the scope of the plaintiff's contractual responsibility as "provid[ing] personnel, equipment, goods and materials when requested by CN Engineering for general work purposes, including emergencies, at the rates and conditions as defined in Schedule One - Rates and Details." TAC ¶ 39. To establish the factual basis for its breach claim, Prewett states that the MSA is a valid and enforceable contract entered into by Prewett and GTW. The factual details provided beyond that pertaining to the breach are largely limited to Prewett's description that it "has provided services" to GTW and its affiliates. *Id.* ¶ 104. Those services are not described any further except by referring to "the work identified" in a previously submitted exhibit containing hundreds of daily work reports filled out by Prewett employees. *Id.* ¶ 113, 144; ¶ 107. The complaint asserts that the work reports, most of which were signed by a representative of the defendants, both describe the services performed and constitute a contractual acceptance,

per paragraph 4.3 of the MSA, by the defendants of those services. Thus, when the defendants stopped making payments on Prewett's invoices stemming from the daily work reports, they breached the terms of the MSA.

To attempt to address the Court's previous oral recommendations regarding the contractual language allowing for the withholding of payment, Prewett then declares that it does not owe any money to either defendant. This portion of the complaint builds upon an earlier section in which Prewett takes issue with the defendants' claims that they properly withheld payment as a result of the plaintiff's misconduct, including forgery and bribery. To rebut those claims, Prewett laments that the defendants have "not produced a single piece of evidence" to support their allegations, which Prewett concludes are "completely false and made up." *Id.* ¶ 95-96. The plaintiff provides nothing to support these conclusory statements. As a result of the purported breach, the plaintiff alleges that "Defendants" owe Prewett $2,005,491.87 as of the time of filing. *Id.* ¶ 131, 133.

The plaintiff's complaint with respect to Count I is lacking in two principal ways. First, despite the Court's explicit recommendations to the contrary, the complaint once again provides virtually no facts providing notice as to the services Prewett allegedly provided to each defendant. What were the services Prewett rendered? When, where, and how were those services rendered? To which defendant were they provided? The problem, moreover, is more complicated than simply failing to distinguish between services provided by Prewett to CNR and GTW; the TAC asserts that the services under the MSA for which Prewett has not been paid were performed not just for CNR and GTW, but for other CNR affiliates as well. *See*, *e.g.*, TAC ¶ 106 ("Prewett has provided services ***to affiliates of GTW*** under the MSA").[5] The TAC, in other words, affirmatively alleges

_____

[5] The same is true as to the bid contracts and the ERSA. *See* TAC ¶ 20 ("For BID contracts, CNR ***or one of its subsidiaries*** places a piece of work out for "bid"); TAC ¶ 149 ("CNR and ***CNR***

that some of the services it provided were for companies other than CNR and GTW, making it impossible for either company to identify the services for which it is alleged to be responsible. That Prewett has dropped those other subsidiaries—formerly defendants—from the TAC does not cure the problem; if anything it confuses the issues further because despite changing the lineup of defendants, and acknowledging that some of the services for which Prewett seeks recovery were provided to companies that are no longer parties, Prewett's damage claims have remained unchanged.[6] In other words, in the TAC, Prewett has simply repackaged all of the claims it had previously asserted against seven defendants as claims against just two defendants. By failing to specify which defendant was responsible for which services, Prewett runs afoul of restrictions on collective pleading. *See, e.g. Bank of America, N.A. v. Knight*, 725 F.3d 815, 819 (7th Cir. 2013) (dismissing a complaint that "go[es] on and on about what defendants collectively did, without imputing concrete acts to specific litigants."); *Rehabcare Grp. East, Inc. v. CC Care, LLC*, No, 15 C 10876, 2016 WL 2595108, at *7 (N.D. Ill. May 4, 2016) (holding that the plaintiff had "engage[d] in improper collective pleading which alone requires dismissal.").

---

*operating subsidiaries* gave other parties—and not Prewett—the first opportunity to perform Derailment Services.").

[6] It is clear that in alleging the damages caused by "the Defendants," Prewett's allegations fail to differentiate not only between the two defendants expressly named in the TAC—CNR and GTW—but also between the other railroad entities who were named as defendants in the first three iterations of Prewett's complaint. Comparing the allegations of the SAC to the TAC, one discovers that the damages alleged against all seven defendants in the SAC are the same as the damages alleged against only two defendants in the TAC (with the exception of the damages alleged based on breaches of the ERSA, which were not alleged in the SAC). *Compare* SAC ¶ 26 (claiming damages of approximately $1.9 million from breach of the MSA by all seven defendants) *with* TAC ¶ 133 (damages of approximately $1.9 million from breach of the MSA by the two remaining defendants); SAC ¶ 35 (claiming damages of approximately $400,000 from breach of bid projects by all seven defendants) *with* TAC ¶ 145 (damages of approximately $400,000 from breach of bid projects by the two remaining defendants).

Rather than include this foundational information in the TAC's allegations, Prewett purports to identify the breaches for which the defendants are responsible by pointing to thousands of pages of invoices and work reports attached to the SAC.[7] The plaintiff includes no summary or explanation of the reports and gives the Court no additional information to help contextualize all of the documents in the exhibit. *See Dal Pozzo v. Basic Mach. Co., Inc.*, 463 F.3d 609, 613 (7th Cir. 2006) ("An advocate's job is to make it easy for the court to rule in his client's favor."). Rather than satisfying FRCP 8(a)(2)'s requirement for "a short and plain statement of the claim showing that the pleader is entitled to relief," Prewett seemingly expects both the defendants and the Court to wade through the morass of documents on their own in order to construct the factual basis for the case and discern which facts and allegations are specific to which defendant.

Prewett contends that it is unreasonable to require it to explain each and every report and invoice attached to the complaint. But this sets up a false dichotomy. Prewett is correct that it need not painstakingly lay out the context and details of each and every one of the reports and invoices, but its apparent solution of providing context and details for *none* of the reports is grossly insufficient. *See, e.g. Families of Spinal Muscular Atrophy v. Nationwide Children's Hosp*., No. 16-cv-4262, 2016 WL 4987944 at *6 (explaining that "merely attaching documents to a complaint" does not satisfy FRCP 8(a)(2)) (St. Eve, J.); *Foley v. Wells Fargo Bank, N.A*., 772 F.3d 63, 79–80 (1st Cir. 2014) ("[I]t is not [the Court's] job, in an effort to ferret out the adequacy of a plaintiff's pleaded allegations, to haphazardly mine documents appended to a complaint."). *Cf.*

---

[7] Prewett opted not to attach the exhibits to the TAC because they are so voluminous and already had been entered on the docket with the filing of the SAC. Although an amended complaint stands on its own, *Flannery v. Recording Indus. Ass'n of Am.* 354 F.3d 632, 638 n. 1 (7th Cir. 2004), the Court does not ground its ruling on Prewett's failure to append the same exhibits to the TAC.

*United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Prewett could have employed any number of strategies to satisfy its burden in this regard. For example, the plaintiff could have categorized the daily work reports by the type of work they described, provided a brief summary of what each type of work entailed, and explained when, where, and for whom that work was completed. Alternatively, Prewett might have described in detail several emblematic work forms and invoices and explained how they illustrate the general patterns seen across the documents as a whole. The plaintiff is right to assert that the federal pleading requirements intentionally set the bar low; unfortunately, the plaintiff has once again failed to clear that bar.

Furthermore, even if the Court were to dive into the attached documents and use them to construct a sufficient summary of the services rendered by Prewett, Count I would remain fatally flawed because it does not adequately address the possibility that the defendants were rightfully withholding payment under the terms of the contract. Paragraph 7.3 of the MSA states:

> CN has the right to dispute in good faith any Rate, invoice or amount invoiced under this Agreement that it considers erroneous, inaccurate or incomplete. CN shall promptly notify Contractor of such dispute and provide an explanation. *CN may withhold any such disputed amount without being deemed to be in breach of its payment obligations* under this Agreement.

TAC Ex. A, ECF No. 58 (emphasis added). The parties agree that this provision allows the CN subsidiaries that are parties to the MSA to withhold payment on Prewett's invoices when they have a good faith dispute concerning their obligation to pay those invoices. Non-payment based on ¶ 7.3, then, is not a breach of the MSA unless Prewett can establish that the invoiced party withheld payment in bad faith. This is essentially the task of a plaintiff asserting a contract claim premised

on breach of the covenant of good faith and fair dealing.[8] It is therefore Prewett's burden to

plausibly show that the defendants are asserting their discretionary rights under § 7.3 in bad faith.

Here, Prewett claims conclusorily that there was no bribery or fraud, but Prewett cannot baldly

assert that the defendants are operating in bad faith; they must allege facts that plausibly support

that claim.

The portions of the TAC relating most directly to this issue are the statements in which

Prewett announces, with no supporting information, that it does not owe the defendants any money

and that the defendants' misconduct allegations are completely fabricated.[9] These statements are

not facts—they are unsupported conclusions. In justifying these conclusory statements, Prewett

counters in its brief that it is impossible to plead a negative and that it is "at a complete loss of

what else it could possibly say" to plead that it did not "cheat Defendants . . . commit fraud, or. . .

engage in a bribery scheme." Pl.'s Resp. to Mot. to Dismiss 10, ECF No. 74. Prewett also contends

that a dismissal on account of this shortcoming would render it impossible for the plaintiff to ever

---

[8] With respect to the covenant of good faith and fair dealing in particular, Illinois law dictates that the covenant can help establish a breach of contract claim, but it cannot "form the basis of an independent cause of action." *Avedas, Inc. v. Intouch Grp., Inc.*, No. 94-CV-06923, 1995 WL 234561, at *3 (N.D. Ill. Apr. 19, 1995) (internal citations omitted). To comply with the covenant, a party must "exercise [its contractual] discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Resolution Trust Corp. v. Holtzman*, 248 Ill.App.3d 105, 112 (Ill. App. 1993).

[9] Prewett also declares that the defendants have not conducted an audit with respect to the MSA. TAC. ¶ 126-128, ECF No. 58. These paragraphs of the TAC are included to refute the defendants' assertion in their counterclaims that they had conducted an audit of Prewett's invoices that revealed fraudulent overcharging. The complaint does not provide any facts, however, to support this claim, although it does include a lengthy footnote containing legal analysis of Seventh Circuit case law on contractual set-offs as it relates to the sufficiency of the defendants' counterclaims. This analysis is misplaced, however, and would be more appropriately included as part of a responsive pleading to the counterclaims. The defendants' counterclaims are only relevant to the motion to dismiss the TAC to the degree that they explain the defendants' good faith basis for withholding payment of MSA invoices.

bring a breach of contract claim with respect to the MSA because Prewett could never satisfy such a pleading standard.

The plaintiff's assertion is unpersuasive. It is not impossible to plead bad faith in non-conclusory terms. Courts regularly require more of complaints with respect to bad faith allegations than Prewett has provided here. *See, e.g., Doyle v. Liberty Mut. Ins.,* No. CV 19-3460, 2019 WL 4917123, at *1 (E.D. Pa. Oct. 4, 2019) ( "Courts consistently hold that bare-bones allegations of bad faith such as these, without more, are insufficient to survive a motion to dismiss. Indeed, conclusory allegations that an insurer "unreasonably withheld the payment of [UIM] benefits under the policy ... failed to engage in good faith negotiations ... [and] failed to perform an adequate investigation" are insufficient to state a claim for bad faith."); *Lohnes v. Liberty Mut. Ins. Co.*, No. 8:19-CV-00068, 2019 WL 4451363, at *4 (N.D.N.Y. Sept. 17, 2019) ("[P]laintiffs are required to plead specific factual allegations of a party's bad faith, as conclusory allegations of a party's failure to act in good faith are insufficient.") (citations omitted) (internal quotation marks omitted). *See also*, *e.g.*, *Northern Trust. Co. v. VIII S. Michigan Associates*, 276 Ill. App. 3d. 355, 368 (Ill. App. 1995) (striking defendants' affirmative defense grounded in the covenant of good faith and fair dealing because the defendants "have simply failed to show any wrongdoing on [the plaintiff's] part."); *Dykstra v. Crestwood Bank*, 117 Ill. App. 3d. 821, 826 (Ill. App. 1983) (affirming dismissal of a complaint because it "contains no factual allegations giving any indication of bad faith dealing on the part of Crestwood Bank [and] merely states the conclusory allegation that Crestwood Bank [acted] 'unlawfully, wrongfully, without just cause and in bad faith'"); *Criscione v. Sears, Roebuck and Co.*, 66 Ill. App. 3d. 664, 669 (Ill. App. 1978) (affirming dismissal in a wrongful termination case in part because "without any showing in the complaint of bad faith on the part of Sears, we find that plaintiff has not stated a contract action against Sears.").

To plausibly allege bad faith performance, Prewett might have to investigate and try to develop information that would make it plausible to infer that the defendants' justification for withholding payments was not genuine. It might report results of its own audit, or that of a third party, to corroborate its claim that there was no overcharging. It might review past communications with defendant personnel for statements attesting to the accuracy of its billings or that are otherwise inconsistent with a claim that Prewett engaged in bribery or fraudulent overbilling. It might point to its own policies and procedures and training programs to show that the company takes measures to ensure the accuracy of its billing. These possibilities hardly exhaust the list, but it is not the Court's function to provide a catalog of ways that Prewett might have adequately alleged bad faith. The point is simply that Prewett's evident inability to allege nonconclusory facts in support of its claim cannot be attributed to the "impossibility" of alleging facts that plausibly show that a counterparty acted in bad faith. The reasonable inference to draw from Prewett's reliance on conclusory allegations of bad faith is that it has not adequately investigated or developed evidence that would permit it to adequately plead bad faith performance of the MSA.

### 3. Count II: Breach of the Bid Contracts

Count II of the TAC is similarly deficient. At the outset, Prewett describes the bid contracts in general terms and focuses on the process by which the parties enter them. Much like it did with the MSA claim, Prewett only relies on the incorporation of exhibits as the factual basis for its claim:

- "The scope of the work under a Bid Contract was as set forth in the particular Bid Contract at issue."

- "As consideration, Prewett performed the services called for in each of the unpaid Bid contracts."

- "The specific bid contract services that are at issue in this lawsuit are set forth in the Daily Work Reports attached to and incorporated into this Complaint as Group Exhibit E."

TAC ¶ 25, 138(D), 139. Just as the attempt to plead facts solely by incorporation of exhibits was insufficient in Count I, so too is it insufficient with Count II.

### 4. Count III: Breach of the ERSA Contract

The third and final breach of contract count relates to the ERSA. Here, Prewett does, finally, include some relevant factual detail as to the services required by the contract. The plaintiff, quoting the relevant language from the contract, explains that under the ERSA, the defendants agreed to give the first opportunity to Prewett to provide emergency services in the case of a derailment in a certain geographical area. The complaint fails to state a claim, however, because it does not plead facts plausibly establishing the alleged breach. Prewett merely declares that the defendants breached the ERSA because they "gave other parties – and not Prewett – the first opportunity" to provide derailment services during a nine-month span in 2013 and 2014. *Id.* ¶ 149. This unsupported conclusion does not plausibly allege that the defendants breached the ESRA. Prewett alleges no facts, for example, to show that there were incidents requiring work covered by the ESRA during that nine-month period or that the absence of service requests in this time period was unusual. Perhaps the defendants frequently went months without requiring derailment services; perhaps the defendants had never gone longer than one week without needing those services; the complaint does not say.[10] What were the relevant derailment incidents that led the defendants to need these services? How many such incidents occurred? Where? When? What other parties were offered these opportunities in Prewett's stead? The TAC answers none of these basic

---

[10] In referring to "the defendants," the Court remains mindful of the overarching point that Prewett has failed to allege facts that show that it has a claim against each defendant.

questions. A conclusory and speculative statement that the defendants offered the services to some unidentified third party at an undefined place and time does not show that the plaintiff is entitled to any relief.

In its response brief, Prewett contends that it has not supported Count III with the types of facts described above because it does not and cannot know them. According to the plaintiff, all it knows is that the defendants "just stopped sending Prewett the emergency Derailment Services work" laid out in the ERSA. Pl.'s Resp. to Mot. to Dismiss 15, ECF No. 74. That is not a compelling excuse for failing to allege facts necessary to plausibly support the conclusory allegation that the defendants suddenly opted to breach the ESRA by calling other companies in lieu of Prewett. Railroads are heavily regulated and statistics about derailment incidents appear to be readily available on the web and from government agencies like the Federal Railroad Administration. But rather than investigate to develop information that might make its claim plausible, or explain why it cannot do so, Prewett again simply throws up its arms and declares that the information is not available to it without discovery. But that approach gets the relationship backwards: a plausible complaint begets discovery, not the other way around. "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. Prewett is not entitled to conduct a fishing expedition at discovery on the basis of a completely unsupported allegation. This is precisely the type of insufficiently pleaded allegation the federal pleading standards are designed to filter out.

5. **Counts IV-VI: "Quantum Meruit for Work Under" MSA, Bid Contracts, and ERSA**

Prewett also pleads three counts of quantum meruit, one for each contract type, in the alternative to its breach of contract claims. In its response to the motion to dismiss, Prewett

withdraws Count VI, its quantum meruit claim for "failure to pay certain ERSA invoices." Pl.'s Resp. to Mot. to Dismiss 17 n. 4, ECF No. 74. The Court thus will only address Counts IV-V.

Counts IV and V are pleaded identically, under headings that read: "Quantum Meruit for Work Under the [respective contract]." TAC 24-25, ECF No. 58. Each count then indicates that the claim is solely pleaded in the alternative to the breach claims and that plaintiff seeks an equitable remedy "[i]n the event that this Court or a jury find that there does not exist a valid and enforceable" contract between the parties. *Id.* ¶ 154, 162. Prewett then broadly states that it performed services that benefitted the defendants, who failed to pay the money owed for those services. As a result, Prewett requests judgment and an award under quantum meruit for both counts.

 Just as the breach of contract claims suffer from a fatal lack of factual allegations, so too do the quantum meruit claims. Illinois law requires a plaintiff seeking relief under the theory of quantum meruit to show "(1) it performed a service to benefit [the defendant]; (2) it performed this service non-gratuitously; (3) [the defendant] accepted this service; and (4) no contract existed to prescribe payment of this service." *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 739 F.Supp.2d 1063, 1086 (N.D. Ill. 2010) (quoting *Owen Wagener & Co. v. U.S. Bank*, 297 Ill. App. 3d 1045, 1053 (Ill. App. 1998) (internal citations omitted). Seventh Circuit case law has reiterated that relief under quasi-contractual theories like quantum meruit are "available only where there is no express contract between the parties*." Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003).

Putting aside the glaring issue that the headings for Counts IV and V explicitly refer to "Work Under the MSA" and "Work Under the Bid Contracts" while work under a contract cannot

support a recovery in quantum meruit,[11] the quantum meruit theory fails for the same reasons that the TAC fails to state a claim for breach of contract. The issue is not the existence of a contract; it is the failure to identify the alleged breaches. As discussed above, Prewett's TAC, within its four corners, contains insufficient factual detail to identify who performed what services for Prewett. If the TAC's allegations are inadequate to state a breach of contract claim, they are similarly inadequate to allege which defendant should have to pay Prewett for the services in the absence of a contract. Counts IV and V allege that "Prewett performed services to benefit the defendants," TAC ¶¶ 155, 163, but these claims leave the defendants equally in the dark about the allegedly uncompensated services for which they are being sued. As with the breach of contract counts, in lieu of allegations that provide notice of the alleged breaches by individual defendants, the quantum meruit allegations point to the MSA and bid contracts and cite the same daily work reports used in Counts I-III..[12] That approach is inadequate, contract or no.

\*       \*       \*

In short, Prewett has once again, despite prior guidance from the Court, failed to state a claim for the three counts of breach of contract and also failed to state a claim for its newly pleaded quantum meruit counts. After four complaints, three motions to dismiss under 12(b)(6), and two motions to dismiss under 12(b)(2), Prewett has still not provided adequate notice of the factual basis of its claims. The Court thus grants the defendants' motion to dismiss Prewett's claims

---

[11] Prewett concedes that these headings are inconsistent with liability under a quantum meruit theory and requests leave to amend the headings if the Court dismisses these counts—but as discussed, the shortcomings of Counts IV and V extend beyond faulty headings.

[12] The parties again devote portions of their briefs to debating whether the named defendants are the true parties to the contracts in question, as well as the impact of that determination on the quantum meruit claims. This issue is particularly irrelevant in the context of the quantum meruit counts, which depend on a determination that there was no contract governing a relationship.

pursuant to Rule 12(b)(6). Prewett has had ample opportunity to cure the deficiencies in its claims but has failed to do so, so it is appropriate at this juncture to deny the claims with prejudice. Dismissal of the TAC renders CNR's motion to dismiss for lack of personal jurisdiction moot; that motion is therefore denied.

Date: November 25, 2019

John J. Tharp, Jr.
United States District Judge